IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AMY FULKERSON,                      )
                                    )
          Plaintiff,                )   Civ. No. 00-6154-AA
                                    )
     v.                             )
                                    )
AMERITITLE, INC., an Oregon         )   OPINION AND ORDER
Corporation; and                    )
LINDA K. STELLE                     )
                                    )
          Defendants.               )
_____)

Roxanne Farra
Roxanne Farra, P.C.
147 S.W. Shevlin Hixon Drive, Ste. 204
Bend, Oregon  97702
     Attorney for plaintiff

Chris Kitchel
Stoel Rives, LLP
900 S.W. Fifth Ave., Ste. 2600
Portland, Oregon  97204
     Attorney for defendants

AIKEN, Judge:

     Amy Fulkerson brought this action against AmeriTitle, Inc.
(AmeriTitle) and its President, Linda K. Stelle, alleging pregnancy
discrimination and hostile work environment in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Or. Rev.
Stat. § 659.030, and common law claims for intentional infliction of

1    - OPINION AND ORDER

emotional distress and negligence.  Defendants move for summary judgment against all claims.  The motion is granted.

## I. BACKGROUND

AmeriTitle is a multi-state corporation that provides title and escrow closing services.  On July 13, 1998, AmeriTitle hired Fulkerson as an escrow assistant to work in its downtown Bend, Oregon office.

In December of 1998, Fulkerson received favorable ratings in her first performance review and earned a raise of $80 per month.  Fulkerson felt "discouraged" by the amount of her raise.  Kitchel Aff., Ex.1, p.37:21 (Fulkerson Depo.)

In January of 1999, AmeriTitle financed Fulkerson's advanced training at "escrow school," which she completed successfully. Afterward, Fulkerson was assigned to train three new assistants.

From the spring of 1999 until her termination in December 1999, Fulkerson was the subject of documented co-worker and customer complaints.  In April of 1999, a mortgage lender phoned AmeriTitle to complain that Fulkerson had been rude and abrupt in demanding that "a check be cut immediately."  Kitchel Aff., Ex.8, p.9 (Schafler Depo.). Fulkerson acknowledges that the interaction took place, but denies having been rude.

In May of 1999, Cindy Schafler, AmeriTitle's general manager, convened a meeting to mediate a personality conflict between Fulkerson and co-worker Connie O'Neil.  At Schafler's request, Libby Hervey, an escrow officer, and Linda Sinclair, Fulkerson's immediate supervisor, attended to help facilitate the meeting.

In June of 1999, Ann Easton, a manager in the title department, sent a written complaint to Fulkerson's supervisor.  According to Easton, on a day when the title department was short staffed, Fulkerson

2    - OPINION AND ORDER

angrily demanded that the department supply her with a report that she had requested some time before. Fulkerson "yelled" at Easton, who was "unsettled" by Fulkerson's conduct. Kitchell Aff., Ex. 8, p.12 (Schafler Depo.)

However, during the same month, a customer sent a letter to Schafler complimenting Fulkerson on the "great job that she does on representing AmeriTitle." Fulkerson Aff., Ex. E. The customer felt "confident" in Fulkerson's abilities to serve borrowers affiliated with her company. The letter was not included in Fulkerson's personnel file.

In July of 1999, Phyllis Darnall, another employee in the title department, complained to Schafler that Fulkerson was rude and uncooperative in response to her requests for help with office tasks.

In July 1999, Fulkerson received another performance review from Sinclair. Sinclair asked Schafler to be present at Fulkerson's review to help discuss Fulkerson's need for improvement in the areas of patience, interpersonal skills, and teamwork. Despite increased complaints from coworkers and customers, Fulkerson's performance scores increased relative to her last review in December of 1998, and she earned a pay raise of $100 per month.

Fulkerson met with Sinclair in late August of 1999 to inform Sinclair of her pregnancy. According to Fulkerson, Sinclair's attitude and conduct toward her changed immediately. On two occasions, Sinclair confronted Fulkerson on the suspicion that Fulkerson had claimed undeserved over-time on her time cards. After the second confrontation, Fulkerson referred to Sinclair as a "fucking bitch"[1] to a co-worker.

---

[1]In a response to defendant's concise statement of facts, filed with the court after the deadline, Fulkerson denies making this comment. However, of the ten citations to the record offered in support of

3    - OPINION AND ORDER

Later, Fulkerson's pregnancy was announced at a regular morning staff meeting. AmeriTitle's president, Linda Stelle, was seated next to Fulkerson and said to the group, "We're going to have more babies than dogs around here if we're not careful." Kitchell Aff., Ex. 1, p.11:10-24 (Fulkerson Depo.).

In November of 1999, a customer phoned Sinclair to report "blunt" and dismissive conduct by Fulkerson. The customer reported that Fulkerson did not handle her request for a document with the proper courtesy.

On December 2, 1999, Fulkerson told Sinclair that she needed to leave work to treat a migraine headache at home. Instead, Fulkerson departed for a vacation in Las Vegas with her husband. Fulkerson called Sinclair the next day from her hotel room in Las Vegas and left word that she was too sick to report to work. Fulkerson told at least three co-workers about her trip either before her termination.

On December 9, co-worker Glenda Cruz heard about Fulkerson's trip to Las Vegas. That evening, Cruz informed Stelle of Fulkerson's unauthorized vacation. Cruz also told Stelle that Fulkerson had referred to Sinclair as a "fucking bitch." Stelle then called Schafler and Sinclair and told them to fire Fulkerson the next day. On December 10, 1999, Sinclair and Schafler terminated Fulkerson's employment.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

---

Fulkerson's denial, one is not in the record and nine make no reference to the comment whatsoever.

Civ. P. 56(c). Substantive law on an issue determines the materiality of a fact. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987).

For purposes of summary judgment, the moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the party moving for summary judgment meets its initial burden, the burden shifts to the non-moving party to show by the production of probative evidence that there are genuine issues of material fact for trial. In re Agricultural Research and Technology Group, 916 F.2d 528, 533 (9th Cir. 1990).

In satisfying its burden, the non-moving party may not rely on the mere allegations or denials of that party's pleadings. Fed. R. Civ. P. 56(e). Instead, it must set forth specific facts admissible in evidence creating a genuine issue for trial. Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985).

Courts adhere to special rules in evaluating summary judgment motions: (1) all reasonable doubts as to the existence of a genuine issue of fact are resolved in favor of the nonmoving party (2) all inferences to be drawn from the underlying facts are to be drawn in favor of the nonmoving party. T.W. Electrical, 809 F.2d at 630. In an employment discrimination case, if a rational trier of fact could find from the evidence that the employer acted for impermissible, discriminatory reasons, summary judgment is inappropriate. Wallis v. J.R. Simplot, 26 F.3d 885, 889 (9th Cir. 1994).

### III. DISCUSSION

A. Pregnancy Discrimination

Plaintiff alleges that she was terminated due to her pregnancy. Title VII of the Civil Rights Act of 1964 prohibits discrimination on

5    - OPINION AND ORDER

the basis of sex with respect to the terms, privileges, compensation or conditions of employment.    42 U.S.C. § 2000e-2(a)(1).    Under the Pregnancy Discrimination Act of 1978 (PDA), discrimination on the basis of pregnancy is a form of sex discrimination actionable under Title VII. 42 U.S.C. § 2000e(k).

A pregnancy discrimination claim is evaluated under the Title VII burden-shifting analysis set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).    A plaintiff alleging discrimination under Title VII may proceed under one of two theories.    Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109 (9th Cir. 1991). Under a theory of disparate impact, a plaintiff must prove that a facially neutral employment criterion has a disproportionate effect on employees within a protected class.    Id.    Under a disparate treatment theory, a plaintiff must prove intentional discrimination on the basis of race, religion, national origin, sex, or in this case, pregnancy. Id.

Here, Fulkerson relies on a disparate treatment theory.    To establish a prima facie case, Fulkerson must show that:  (1) she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she was discharged; and (4) she was treated differently from other persons outside of her protected class. McDonnell Douglas, 411 U.S. at 802.    Furthermore, "proof of discriminatory motive" by AmeriTitle is "critical" to her claim. International Bd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

If Fulkerson successfully establishes a prima facie case of pregnancy discrimination, the burden then shifts to AmeriTitle to furnish a legitimate, nondiscriminatory reason for her discharge.

6    - OPINION AND ORDER

Sischo-Nowejad, 934 F.2d at 1109. If AmeriTitle comes forward with such evidence, Fulkerson may rebut AmeriTitle's articulated reason with direct or circumstantial evidence of pretext and an underlying motive of discrimination. Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir. 1985). Circumstantial evidence of discrimination must be "specific and substantial." Goodwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).

Fulkerson became pregnant while employed at AmeriTitle and was a member of a protected class for purposes of the PDA and Title VII. Additionally, her discharge from AmeriTitle on December 10 is well documented and is not in dispute. Thus, Fulkerson must prove the remaining elements of satisfactory work performance and differential treatment in order to establish a prima facie showing of pregnancy discrimination.

Defendants contend that Fulkerson's deception and use of sick leave to take an unauthorized vacation render her work performance unsatisfactory. They maintain that Fulkerson's negative attitude and poor interpersonal skills posed problems for her co-workers and supervisors even before the announcement of her pregnancy and her unscheduled departure for Las Vegas.

Plaintiff relies on the persuasive authority of MacDonald v. Eastern Wyoming Mental Health, 941 F.2d 1115 (10th Cir. 1991) and Leisek v. Brightwood Corp., 2000 WL 900492 (D. Or. 2000), to argue that AmeriTitle cannot use evidence of its legitimate, nondiscriminatory reason for Fulkerson's discharge to attack Fulkerson's prima facie case. I do not find the precedent cited by plaintiff to be controlling.

In Leisek, the Court conducted a fact specific inquiry to determine whether a National Guardsman had official orders to report for active

7    - OPINION AND ORDER

duty when he missed scheduled work days at his place of employment. Although the Leisek court offers a brief reiteration of the McDonnell Douglas burden-shifting analysis, it does not discuss the issue of considering the employer's reason for termination at the prima facie stage. Leisek, 2000 WL 900492 at 3-5. Furthermore, in finding that the National Guard had not ordered plaintiff to extend the duration of his out of state activities, the Leisek court concluded that an employee with unauthorized absences from work failed to make a prima facie showing of discrimination, a result inconsistent with plaintiff's argument. Id. at 5.

In MacDonald, the Tenth Circuit concluded that defeating plaintiffs' prima facie case with reasons proffered for their discharge "raises serious problems under the McDonnell Douglas burden-shifting analysis, which mandates a full and fair opportunity for a plaintiff to demonstrate pretext." MacDonald, 941 F.2d at 1119. The reasoning in MacDonald has not been adopted by the Ninth Circuit. Moreover, the facts underlying MacDonald limit its relevance to the present case. The plaintiff in MacDonald, a psychologist, reported unethical practices taking place at his employer's mental health clinic. Immediately thereafter, plaintiff was placed on six month's probation for an undisclosed breach of confidentiality and "other negative community feedback." MacDonald, 941 F.2d at 1117. When plaintiff denied his employer's allegations and refused to comply with his probation, he was terminated. Plaintiff's subsequent lawsuit alleged both age discrimination and unlawful discharge in violation of his First Amendment right to speak out against ethical violations at his place of employment. The Tenth Circuit held that the strong inference of retaliation, coupled with the mixed motives alleged by plaintiff,

8    - OPINION AND ORDER

required the court to make a searching inquiry at the pretext phase of the <u>McDonnell-Douglas</u> analysis, rather than disposing of the claims at the prima facie stage.

Here, in contrast to the facts in <u>MacDonald</u>, there is no allegation or inference of retaliation, and Fulkerson admits to the substance of AmeriTitle's claim of her unsatisfactory work performance – that she lied to her supervisors and took an unauthorized vacation. Although Fulkerson alleges workplace violations in the form of a hostile work environment, she did so only after her termination. Finally, because attending work on scheduled days is a sine qua non of any employment agreement, it is integral to the overall assessment of satisfactory work performance.

Additionally, plaintiff fails to show that she was treated differently from similarly situated persons outside the protected class. Although Fulkerson was "aware" that other employees called in sick to secure vacation or travel days, she fails to offer evidence that others did so with the knowledge of their supervisors. Fulkerson also alleges that AmeriTitle gave a male employee several chances to return to work during an unauthorized absence before his eventual discharge. However, at oral argument, defendants clarified that the male employee's absences arose from a surgery and subsequent recovery period whose length was in dispute. More importantly, the employee did not lie about the reason for his absences before leaving work.

Finally, Fulkerson notes that AmeriTitle failed to discipline a non-pregnant employee who accumulated 33 absences due to sickness, funerals, and court appearances over a twenty two month period. While the employee's absences may have been numerous, there is no indication that the employee lied about her whereabouts.

9    - OPINION AND ORDER

1    Even if Plaintiff's unauthorized vacation and deception are not
considered at the prima facie stage, they constitute a legitimate, non-
discriminatory reason for her discharge.  Fulkerson admits that she took
2
an unauthorized vacation, lied to her employer, and does not deny
3
referring to her supervisor as a "fucking bitch."  Therefore, in order
4
to avoid summary judgment at the pretext stage, Fulkerson must provide
5
either direct evidence of a discriminatory motive or circumstantial
6
evidence in the form of specific facts showing that AmeriTitle's
7
articulated reason is not credible.  <u>Lindahl v. Air France</u>, 930 F.2d
8
1434, 1437-38 (9th Cir. 1991).
9
10    The gravamen of Fulkerson's pretext argument is that when her
supervisors fired her, they were unaware of her trip to Las Vegas and
11
were motivated by discriminatory reasons rather than legitimate
12
employment considerations.  Fulkerson asserts that a genuine issue of
13
fact exists as to whether Cruz notified Stelle of Fulkerson's
14
misconduct.  Therefore, Fulkerson maintains that defendant cannot rely
15
on it as a legitimate reason for her termination.
16
17    I find plaintiff's speculation that her employers conspired to
fabricate a post-hoc justification for her discharge unpersuasive and at
18
odds with substantial evidence that Stelle learned of plaintiff's
19
unauthorized vacation on December 9.  Dinner guests visiting Stelle's
20
home on December 9 observed Stelle talking to Cruz on the telephone.
21
<u>See</u> Kitchell Aff., Ex.11, p.2:12-25; Ex.12, p.3:2-18.  Telephone records
22
confirm that communication between Cruz and Stelle occurred on the
23
evening of December 9.
24
25    Nevertheless, plaintiff argues that the phone records show a call
originating from Stelle to Cruz, rather than from Cruz to Stelle, as
26
defendants originally claimed.  However, to the extent that any
27
10   - OPINION AND ORDER

discrepancy in sequence constitutes an issue of fact, it is not a material one. The telephone records confirm that, after talking with Cruz, Stelle placed a call to Schafler on the same evening. Schafler and Sinclair discharged Fulkerson the next day.

Plaintiff also asserts that, contrary to Cruz's testimony, Cruz could not have learned of plaintiff's deception from Libby Hervey. While Libby Hervey denies telling Glenda Cruz about plaintiff's unauthorized vacation, Fulkerson did not conceal her trip to Las Vegas. She admits to telling at least three co-workers about it, including Libby Hervey. Kitchell Aff., Ex.1, p.196:10-15 (Fulkerson Depo.); Pltf. Depo. Tr. Ex.A-O, Hervey Depo., 73-74.[2] Thus, any alleged discrepancy regarding the manner in which Cruz learned of Fulkerson's vacation is not material to the basic fact that Stelle was aware of Fulkerson's deception when she ordered Fulkerson's discharge.

Additionally, in a response to plaintiff's request for unemployment benefits, dated Dec. 21, 1999, Stelle cited "lying about being sick and going on vacation to Las Vegas" as one reason for Fulkerson's discharge. Stelle Aff., ¶ 2, Ex. A. Stelle prepared the response eleven days after Fulkerson's termination, well before AmeriTitle was on notice that Fulkerson was asserting a claim against the company.

Finally, Fulkerson asserts that her supervisors never mentioned the trip to Las Vegas when they fired her. Fulkerson emphasizes that none of the internal memoranda generated during her final meeting with management references her unauthorized vacation. Instead, Fulkerson's

---

[2]In her opposition brief, plaintiff argues strenuously that she complied with AmeriTitle's leave policy by telling Libby Hervey that she would be away from the office from December 2-3. It is perplexing that plaintiff attempts to demonstrate that she sought permission for her vacation while simultaneously arguing that her vacation remained a secret until after her discharge.

11  - OPINION AND ORDER

supervisors cited plaintiff's negative attitude as the reason for her discharge.  I do not find these facts sufficient to create a genuine issue of fact as to whether Stelle knew on the evening of December 9 that plaintiff lied to her supervisors and took an unauthorized vacation.  The memoranda merely recorded the substance of Sinclair and Schafler's conversation with Fulkerson.  While the memoranda reflect Sinclair and Schafler's omission of the Last Vegas trip from their conversation with Fulkerson, they do not, in and of themselves, reflect evidence of a discriminatory motive.  The timing of Fulkerson's termination, telephone records, undisputed witness testimony, and AmeriTitle's response to Fulkerson's request for unemployment benefits support defendants' assertion that Stelle knew of Fulkerson's unauthorized vacation.  I find no genuine issue of material fact exists to dispute Stelle's knowledge of Fulkerson's misconduct as of December 9.  Aside from speculation, plaintiff presents no evidence to rebut these facts and I find them uncontroverted.[3]

Next, Fulkerson contends that Linda Stelle's comments reveal her intent to discriminate on the basis of pregnancy.  Specifically, plaintiff claims that Stelle's comment, "If we're not careful, we're going to have more babies than dogs around here," upset Fulkerson and "shocked" a co-worker.  Kitchell Aff., Ex.1, p.14:10-11 (Fulkerson Depo.).  Fulkerson claims that a co-worker overheard Stelle ask a recently-married employee whether she was planning to have children. When the employee told Stelle that she could not conceive children because her "tubes were tied," Stelle replied, "That's how you get a

---

[3] Plaintiff moves to bifurcate the issue of whether defendants knew of her Las Vegas vacation prior to her termination.  There is no basis for such a request, and regardless, it is moot.

12   - OPINION AND ORDER

raise around here." Pltf. Depo. Tr. Ex. P-Z, Shopfer Depo., p.22:22-23.[4]

While Stelle's comments do not reflect sensitivity to the reality of pregnant employees in the workplace, "stray remarks" unrelated to the adverse employment decision are not probative of discrimination. <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 251 (1989)(plurality); <u>Harris v. Itzhaki</u>, 183 F.3d 1043, 1055 (9th Cir. 1999). Further, Fulkerson fails to establish when Stelle allegedly made the statement about getting a raise and Stelle's comment about dogs and babies was not made close in time to Fulkerson's termination. Thus, Stelle's remarks do not constitute specific and substantial evidence of pretext.

Finally, Fulkerson asserts that AmeriTitle subjected a former employee, Heather Ochoa, to pregnancy discrimination. Specifically, Fulkerson claims that Ochoa was "somewhat hassled" about the way that she dressed during her pregnancy, and that AmeriTitle failed to make a part-time schedule available to Ochoa even though two non-pregnant employees were permitted to work part time. Pltf. Depo. Tr. P-Z, Fulkerson Depo., 289:7-10.

The record does not support Fulkerson's allegation that Ochoa suffered pregnancy discrimination at AmeriTitle. In fact, none of Fulkerson's co-workers testified to personal knowledge of any difference in the treatment Ochoa received after her pregnancy. <u>See</u> Pltf. Depo. Tr. Ex. P-Z, Petford Depo., 24:11-13; Shopfer Depo., 21:16-21. Although Ochoa's untimely affidavit describes calling upon the Bureau of Oregon Labor and Industry to intervene in a disagreement with AmeriTitle over the duration of her maternity leave, the matter was resolved and Ochoa

---

[4] Defendants move to strike this comment, arguing it is inadmissible hearsay. However, it may be admitted as a statement of declarant's then existing mental state, including motive or design. Fed. R. Evid. 803(3).

13   - OPINION AND ORDER

never filed a complaint.

In sum, plaintiff fails to establish a prima facie showing of satisfactory work performance or differential treatment to support her pregnancy discrimination claims under Title VII or Or. Rev. Stat. § 659.030. In addition, she fails to offer evidence that defendants' legitimate, non-discriminatory reason for her dismissal was a pretext for pregnancy discrimination.

B. Hostile Work Environment

Plaintiff also claims that Stelle and her co-workers subjected her to a hostile work environment. It is well established that Title VII's prohibitions against sex discrimination extend to sexual harassment in the form of *quid pro quo* advances or a hostile work environment. See e.g., Meritor Savings Bank, F.S.B. v. Vinson, 477 U.S. 57 (1986); Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864 (9th Cir. 2001). A hostile work environment exists where harassment is sufficiently severe and pervasive to alter the terms and conditions of the victim's employment and to create an abusive working environment. Kortan v. California Youth Authority, 217 F.3d 1104, 1110 (9th Cir. 2000). Harassment in a hostile work environment need not be of an overtly sexual nature, but it must be motivated by the victim's gender. Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 79 (1998).

Here, Fulkerson alleges that her co-workers made offensive comments about her pregnancy and resulting changes to her physique. Specifically, her deposition identifies a cluster of incidents taking place after the announcement of her pregnancy in August of 1999.

In September of 1999, escrow officer Vicki Russell told Fulkerson, "Your tits are getting huge." Kitchell Aff., Ex.1, p.10:17 (Fulkerson Depo.). At a later date, when Fulkerson and Russell heard a baby crying

14   - OPINION AND ORDER

in the office lobby, Russell said, "something to the effect of 'you better get ready, Amy. You better get used to that because that's what you are going to be hearing all the time-- a baby screaming in your ear.'" Kitchell Aff., Ex.1, p.12:1-7 (Fulkerson Depo.).

During the same interaction with Russell, Cyndi Zollner, an escrow assistant overheard the crying baby and asked Fulkerson if her "tits were leaking yet." Id. at 12:23-24. When Zollner asked Fulkerson if she could feel the baby "moving yet," another coworker, Libby Hervey, remarked, "All she can feel moving are her tits." Id. at 14:4-8. Fred Anderson, a coworker from a neighboring department, referred to Fulkerson as "Preggo" on several occasions. Anderson's name calling persisted after Fulkerson asked him to stop. Finally, Fulkerson cites Stelle's comment: "We're going to have more babies than dogs around here if we're not careful," as evidence of a hostile work environment.

Fulkerson argues that, taken together, the exchanges involving the crying baby in the office lobby, and the comments of Stelle and Anderson, create a genuine issue of material fact as to the existence of a hostile work environment. I disagree.

To determine whether alleged harassment is "severe and pervasive," the court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating. . .and whether it interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents" do not rise to the level of severe and pervasive harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

I find that the plaintiff fails to show that her co-workers' conduct was either severe or pervasive. Although Fulkerson asserts that

15  - OPINION AND ORDER

she was subjected to a three-month period of harassment, the majority of comments were made during one, isolated conversation involving Hervey, Russel, and Zollner.  See Kortan, 217 F.3d at 1110. ("There is no question that [the alleged harasser's] remarks were offensive.  The difficulty is that they were mainly made in a flurry on February 3rd.") Some time after the conversation, Fulkerson accepted an apology from Libby Hervey, and plaintiff did not encounter offensive behavior from Hervey, Russel, or Zollner after that conversation.  Kitchell Aff., Ex.1, p.12:16-19 (Fulkerson Depo.); Ex.1, p.49:22-p.50:1.

In Draper v. Coeur Rochester, Inc., 147 F.3d 1104 (9th Cir. 1988), the Ninth Circuit found severe and pervasive harassment where, over a two-year period: the plaintiff's supervisor told her of his sexual fantasies involving both his wife and plaintiff; made frequent comments about plaintiff's "ass"; used the company loudspeaker to announce that if plaintiff needed to change clothes, several of her male coworkers would help; and frequently told plaintiff's co-workers of his desire to "get into her pants."  Id. at 1104-07.

Similarly, in Nichols v. Azteca Restaurant Enterprises, Inc., 256 F.3d 864 (9th Cir. 2000), the Ninth Circuit found a hostile work environment where a male waiter was subjected to a "relentless campaign of assaults" by male co-workers who repeatedly referred to him as "she" and "her," taunted him for carrying his tray "like a woman" and referred to him as a "fucking female whore."  The Nichols court noted that the episodes of harassment were "not isolated or stray," and occurred "at least once a week and often several times a day."  Id. at 870.

The conduct alleged by Fulkerson does not approach the level of severity or pervasiveness of that in Draper and Nichols.  The majority of the harassment alleged by plaintiff occurred during one conversation

16   - OPINION AND ORDER

and ceased after an apology. The only alleged harassment that continued for any length of time was Anderson's name calling. On the whole, I conclude that the conduct did not constitute severe and pervasive harassment under Title VII.

Even if a reasonable juror could find the alleged harassment to be severe and pervasive, Fulkerson has not raised sufficient facts to demonstrate that AmeriTitle knew or should have known of the harassment. "Once an employer knows or should have known of [coworker] harassment, a remedial obligation kicks in." <u>Nichols</u>, 256 F.3d at 875, (citing <u>Fuller v. City of Oakland</u>, 43 F.3d 1522, 1528 (9th Cir. 1995)).

Fulkerson asserts that she reported the alleged harassment to Libby Hervey, her "immediate supervisor" and Mary Crawford, "AmeriTitle's Accounting Supervisor." Memorandum in Opposition to Summary Judgment at 26. However, Libby Hervey was employed as an escrow officer. Hervey Aff., ¶ 1. Although Fulkerson was assigned to Hervey to work as her assistant, escrow officers do not exercise supervisory authority over their assistants. Schafler Aff., ¶ 7. Furthermore, Fulkerson's complaint identifies Linda Sinclair, not Libby Hervey, as her "direct supervisor." Compl., ¶ 9. Fulkerson never notified Sinclair of the alleged harassment. Likewise, Crawford did not exercise supervisory authority over AmeriTitle employees. Pltf. Depo. Tr. Ex. A-O, Crawford Depo., 4:21-24. Fulkerson's own account of the events establishes that she did not notify a direct supervisor of any mistreatment from coworkers. Fulkerson depo. vol. I, 32: 8-10; 38:4-6. ///

> Q: And did you ever report any of this to any
>    manager or supervisor?
>
> A: No.  I did not.

17   - OPINION AND ORDER

Kitchell Aff., Ex.1, p.14:11-13 (Fulkerson Depo.).

While Fulkerson addressed the matter with Hervey, Fulkerson's account of their discussion demonstrates that her objective was not to invoke an internal grievance process.

> A: I told Libby my feelings about what had
> happened and about how upsetting it
> was...because I considered her to be a
> friend.  And she apologized to me.
>
> Q: Did she explain to you why she made her
> comment?
>
> A: No.  There was no explanation regarding
> her comment that I can recall.
>
> Q: And she apologized.  Did you refuse to
> accept her apology?
>
> A: No.  I accepted her apology and we hugged.

Kitchell Aff., Ex.1, p.47:21-p.48:9 (Fulkerson Depo.).

Finally, Fulkerson had been employed by AmeriTitle for over a year before the alleged harassment took place.  Although AmeriTitle did have an anti-harassment policy in place, Fulkerson failed to avail herself of its protections.  See Burlington Industries v. Ellerth, 524 U.S. 742, 765 (1998) (Employer may raise an affirmative defense to harassment if the employer took reasonable care to prevent harassing behavior and plaintiff employee failed to invoke anti-harassment policies implemented by the employer).  Consequently, liability for the alleged harassment cannot be imputed to AmeriTitle.

### C. Intentional Infliction of Emotional Distress

Plaintiff also asserts claims of intentional infliction of emotional distress (IIED) against AmeriTitle and Stelle.  Under Oregon law, a plaintiff alleging IIED must show that: (1) the defendant intended to cause plaintiff's severe emotional distress; (2) the defendant's acts were the cause of plaintiff's severe emotional

18   - OPINION AND ORDER

distress; and (3) that the defendant's acts transgressed the bounds of socially tolerable conduct. <u>Sheets v. Knight</u>, 308 Or 220, 236, 753 P.2d 955, 1000 (1988).

The focus of IIED cases is not on the result, but on the purpose and means used to achieve it. <u>Madani v. Kendall Ford, Inc.</u>, 312 Or. 198, 205 818 P.2d 930, 934 (1991). Thus, termination of an employee by an at-will employer, even when motivated by an improper purpose, does not constitute a transgression from the bounds of socially acceptable conduct. <u>Madani</u>, 312 Or. at 204-205, 818 P.2d at 934.

In <u>Madani</u>, the Oregon Supreme Court found that an employee terminated for refusing repeated orders to "pull down his pants" and expose himself did not state a claim for intentional infliction of emotional distress based solely on his termination. <u>Id.</u> at 203-206, 818 P.2d at 933-934. Plaintiff acknowledged that had he been retained by his employer, he would not have brought suit. <u>Madani</u>, 312 Or. at n.4, 818 P.2d at n.4.

Here, Fulkerson alleges that her discharge was one of several acts by AmeriTitle and its staff that caused her severe emotional distress. However, Fulkerson is an at-will employee. No evidence in the record suggests that the means used to effectuate her discharge were socially intolerable. <u>See</u> Kitchell Aff., Ex.5, p.12 (Sinclair Depo.). Thus, the mere act of Fulkerson's firing cannot serve as a basis for her claim of intentional infliction of emotional distress.

In addition to her firing, Fulkerson alleges that her coworker's and Linda Stelle's remarks regarding her pregnancy constitute conduct "beyond the bounds of reasonable social tolerance." Comp., ¶ 33. While such comments may have been insensitive and arguably offensive, conduct that is "merely rude, boorish, tyrannical, churlish and mean" does not

19    - OPINION AND ORDER

rise to the level of intentional infliction of emotional distress. Patton v. J.C. Penney Co., 301 Or. 117, 124, 719 P.2d 854 (1986). Further, Hervey and Zollner's alleged tortious conduct do not demonstrate an intent to inflict severe emotional harm.  After Fulkerson made her feelings known to Hervey, the two women discussed the matter and Hervey apologized.  Kitchell Aff., Ex. 1, p.48:1 (Fulkerson Depo.). After the apology, the two women hugged.  Id., at 48:8-9.  Hervey and Zollner presented Fulkerson with a new maternity outfit at work a week later.   Id. at 49.    None of the conduct at issue represents the egregious, harmful behavior encompassed by the tort of intentional infliction of emotional distress.

D. Negligence

Finally, Fulkerson alleges that AmeriTitle was negligent both in retaining employees who made abusive remarks and in failing to take corrective measures to improve a hostile work environment.  Compl. ¶ 38. Thus, Fulkerson's negligence claim is premised on the existence of sexual harassment and or tortious conduct in the workplace.  Because Fulkerson has failed to create a genuine issue of material fact as to either, her employer cannot be held liable under a theory of negligence.

///
///
///
///
///
///
///
///
///

20  - OPINION AND ORDER

## IV. CONCLUSION

For the foregoing reasons, AmeriTitle's and defendant Stelle's motions for summary judgment (docs. 45, 42 ) are GRANTED.  Plaintiff's complaint is HEREBY DISMISSED.  Plaintiff's Motion to Bifurcate (doc. 69) and defendant's Motion to Strike (doc. 77) are DENIED as moot.

IT IS SO ORDERED.

Dated this 11th day of December, 2001.


                                    /s/ Ann Aiken
                              Ann Aiken
                              United States District Judge

21   - OPINION AND ORDER